# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF MISSISSIPPI
### OXFORD DIVISION

**VERIZON WIRELESS TENNESSEE PARTNERSHIP**
**d/b/a VERIZON WIRELESS**                                                    **PLAINTIFF**

**v.**                                                    **CIVIL ACTION NO.: 3:18cv043-MPM-JMV**

**DESOTO COUNTY, MISSISSIPPI;**
**DESOTO COUNTY BOARD OF SUPERVISORS;**
**JESSIE MEDLIN, MARK GARDNER, BILL RUSSELL,**
**LEE CALDWELL, and MICHAEL LEE**
**in their official capacities**
**as members of the DeSoto County Board of Supervisors,**                    **DEFENDANTS**

## ORDER

On December 2, 2019, this court held a hearing in the above-entitled action to consider plaintiff Verizon Wireless' ("Verizon") motion for a permanent injunction ordering defendant Desoto County to approve its application for a conditional use permit to build a cell-phone tower at a location known as the Proposed Sugarcoated Site. This court, having considered the parties' briefing, the administrative record, and the arguments at the hearing, is prepared to rule.

Verizon filed the instant action under the Communications Act of 1934, as amended by the Telecommunications Act of 1996, 47 U.S.C. § 332(c)(7), (the "TCA" or "the Act"), alleging that defendant Desoto County, acting through its Board of Supervisors, violated federal law by denying it permission to construct the wireless telecommunications tower at issue in this case. Verizon alleges (and the County denies) that a gap exists in its cell phone coverage in the area which requires the building of an additional wireless tower. Verizon accordingly filed, on or about October 4, 2017, a conditional use application to build a one hundred and ninety (190) foot

1

monopole wireless communications tower in western Desoto County.  The Desoto County Board

of Supervisors ("the Board") held a public hearing on Verizon's application on December 18,

2018, following which it unanimously voted to deny the application.

In its January 22, 2018 resolution denying the Application, the Board gave five grounds

for its decision:

> 1. There is insubstantial proof as to whether there exists a gap in coverage for the area to be serviced by the proposed cell tower;
> 2. There is insubstantial proof as to whether existing towers could or could not be enhanced so as to provide improved service to the area;
> 3. There is not sufficient evidence, there will be significant aesthetic effects to the community. [sic][1]
> 4. The no build zone of 142.5 feet, set forth in the DeSoto County Zoning Ordinance, has not been met, as the distance to property line of the James' property is 137 feet, and the first outbuilding is 178 feet away and tower is 190 feet.
> 5. The construction of the tower will adversely affect the drainage in this area.

[Joint Exhibit 5].   In seeking a permanent injunction, Verizon argues that there was insubstantial

evidence to support any of these findings and that this court should effectively vacate the

Board's decision through its injunctive powers.

As the Fifth Circuit has noted, "substantial evidence' is 'such reasonable evidence that a

reasonable mind would accept to support a conclusion.'" *Poly-America, Inc. v. NLRB*, 260 F.3d

465, 476 (5th Cir. 2001).  A finding of substantial evidence requires "more than a mere scintilla

and less than a preponderance." *Masterson v. Barnhart,* 309 F.3d 267, 272 (5th Cir.2002)

(quoting *Newton v. Apfel,* 209 F.3d 448, 452 (5th Cir. 2000)).  … However, the reviewing court

may not "re-weigh the evidence or substitute [its] judgment" for the judgment of the local

government. *Boyd v. Apfel,* 239 F.3d 698, 704 (5th Cir. 2001). Substantial evidence review is

---

[1] Defendant concedes that there is a typographical error in this finding and that the County intended to assert that there would, in fact, be a significant aesthetic impact on the community.

therefore "highly deferential." *VoiceStream Minneapolis, Inc. v. St. Croix County,* 342 F.3d 818,

830 (7th Cir. 2003) (quoting *Second Generation Props., L.P. v. Town of Pelham,* 313 F.3d 620,

627 (1st Cir. 2002)). The plaintiff carries the burden of proving that no substantial evidence

supports the local government's decision. *VoiceStream,* 342 F.3d 818, 830–31 & n. 5; *Am. Tower

LP v. City of Huntsville,* 295 F.3d 1203, 1207 (11th Cir. 2002). Having noted the applicable

standard of review, this court now turns to a discussion of the Board's five findings in this case.

**1. There is insubstantial proof as to whether there exists a gap in
coverage for the area to be serviced by the proposed cell tower;**

**2. There is insubstantial proof as to whether existing towers could or
could not be enhanced so as to provide improved service to the area.**

This court first considers Verizon's objections to the Board's initial finding, namely that

"[t]here is insubstantial proof as to whether there exists a gap in coverage for the area to be

serviced by the proposed cell tower." Closely related is the Board's second finding, which stated

that "[t]here is insubstantial proof as to whether existing towers could or could not be enhanced

so as to provide improved service to the area." Each of these findings relates to the basic need

for the project, which this court regards as the most consequential one in this case. The issue of

need goes to the heart of the TCA's basic approach, which is to show deference to the right of

local governments to make land use decisions, but only to the extent that those decisions do not

prevent providers from addressing "substantial gaps" in coverage.

Federal law aside, it strikes this court that the basic burden of any company or individual

seeking to proceed with a land use project in the face of public opposition is to demonstrate that

it is needed. In deciding whether Verizon demonstrated that the project in this case was needed,

it is first necessary to determine under what standards that need is to be assessed. As to this

issue, Verizon asserts that "numerous decisions" have held that "a lack of 'in-building' coverage is the standard for establishing [a] substantial gap in coverage." [Brief at 6, *citing Branch Towers, LLC v. City of Knoxville*, No. 3:15-CV-00487, 2016 WL 3747600, at *6 (E.D. Tenn. July 11, 2016).

This court's reading of federal authority in this context is that in-building coverage has been deemed one part of the required showing, along with in-vehicle and outdoor coverage. *See T-Mobile Cent., LLC v. Wyandotte County, Kansas*, 528 F. Supp. 2d 1128, 1169 (D. Kan. 2007). However, the district court in *Wyandotte County* made it clear that isolated "dead spots" in coverage do not necessarily indicate a "substantial" gap in coverage, writing that:

> In so holding, the Court is mindful that the TCA does not guarantee T–Mobile seamless coverage in every location within the targeted area. Indeed, courts have expressly recognized that the presence of "dead zones," or pockets in which coverage does not exist, are not actionable for purposes of arguing effective prohibition claims under the TCA. Here, however, T–Mobile has proven that its lack of in-building coverage within the area to be served by the new tower is widespread, and qualifies as more than mere "dead spots."

*Id.* at 1169-70. This court notes that the proof of coverage gaps presented by the provider in *Wyandotte County* was vastly greater than that presented by Verizon in this case. For example, the district court noted in that case that:

> In conjunction with re-submission of the propagation maps, T–Mobile also submitted results of a drive-test conducted at City Staff's request, which confirms the propagation prediction analysis establishing a significant in-building service coverage gap. T–Mobile's radio frequency engineer explained the propagation maps and the drive tests at the April 10 Planning Commission hearing. … In addition to the propagation maps and drive-test, T–Mobile also presented evidence of dropped calls. This evidence certifies that in one week, customers "dropped" 1,812 calls in the targeted area and that in another week, T–Mobile customers "dropped" over 2,700 calls in the targeted area. … Finally, T–Mobile's coverage gap consists of a sizeable area in which approximately 600 households have no in-building coverage.

*Id.* at 1166-67. As discussed below, Verizon did not present evidence of need even remotely comparable to this evidence in *Wyandotte County*.

This court recognizes that the issue of whether a "significant gap in coverage" exists is separate and distinct from that of whether the county had substantial evidence in support of its conclusion that a gap existed at all. Nevertheless, it seems quite significant that, in addressing the issue of whether gaps in coverage exist, federal courts have considered the coverage experienced by actual residents. This court can discern no reason why this approach would not also apply in deciding whether the County had substantial evidence in support of its conclusion that Verizon had failed to demonstrate any gap in coverage, substantial or not. At the December 2 hearing, counsel for Verizon did not appear to question this premise, and it would frankly strike this court as absurd to base conclusions about the level of coverage in a given area on anything other than the experiences of actual human beings.

This court presumes that Verizon has legitimate business reasons for wanting to build the cell phone tower at issue in this case, or else it would not have taken the time and expense to litigate this matter at all. Nevertheless, not all projects which a telecommunications provider believes will benefit its bottom line provide corresponding benefits to residents, and this court regards it as significant that Verizon concedes that federal courts have found that the issue of gaps in coverage should be understood in terms of the coverage experienced by actual residents. The expert report which Verizon relies upon as its central proof in this case, prepared by its engineer Gil Tomlinson, is written in vague terms of "offloading Verizon's existing sites" as a result of "heavy usage stemming from the new Verizon Unlimited Data Plan." [Tomlinson report at 1]. This court regards this potion of Tomlinson's report as representing, perhaps, a rare moment of candor which Verizon may now regret, as it seeks to shoehorn this case into the federal precedent dealing with the actual gaps in coverage, which have not been demonstrated in this case. Indeed, Verizon does not offer a single case suggesting that, if a provider makes a

business decision to offer an Unlimited Data Plan, and suffers congestion as a result, then it may use the TCA as a means of forcing local governments to approve, over the objections from residents, new cell phone towers which accommodate that business decision.

To the extent that Tomlinson's report paid lip service to any actual gaps in coverage, it did so through highly conclusory language lacking any specific reports from residents. Moreover, Tomlinson prepared a map depicting an alleged "low coverage" area in blue with no explanation of what "low coverage" means in terms of actual residents. [Tomlinson letter at 1-2]. Given the lack of specifics from Tomlinson's report on this issue, it strikes this court as quite significant that, at the hearing below, the only proof from actual residents regarding the coverage they experienced was that no gap in coverage existed. For example, Supervisor Bill Russell affirmed at the hearing that he had personally tested the coverage in preparation for the hearing and found it to be satisfactory. Specifically, Russell stated at the hearing that:

> [T]he applicant twice has stated a definite gap in service, and I personally drove this entire area, a three mile area around this area Saturday -- this last Saturday and last night at nine o'clock with a Verizon phone and determined that to be untrue. I had at least two bars in that entire area. I had a gentleman with me, and we called each other back and forth, and there was no gap in service.

[Hearing transcript at 64]. Similarly, area resident Judy James testified that:

> Our neighbors don't want this. We talked with them directly. No one said, "Oh, yay, my cell phone hasn't been working very well." Nobody said that. They said, "No, we do not need that in this area."

[Hearing transcript at 33].

In its brief, Verizon dismisses this testimony as that of "lay witnesses," [Trial brief at 7] but Supervisor Russell's account is frankly more helpful to this court in understanding the actual degree of coverage in the area in question than anything presented in Tomlinson's report. If Verizon believes that Russell's description of coverage is incorrect, then it should have presented

its own testimony to the effect that residents in a particular location were unable to receive satisfactory coverage. As quoted above, the provider in *Wyandotte County* did just that, in great detail. In this case, Verizon's only witness at the hearing was David McGehee, an alleged real estate agent whose primary role seemed to be to present Tomlinson's expert report dealing with engineering matters which McGehee was not qualified to discuss. Perhaps there is some logic to having an expert report prepared by an engineer be presented by a real estate agent, but, if so, then that logic escapes this court. Indeed, this strikes this court as only making sense if the provider believes that their engineer is unable to answer hard questions about the representations in his report and therefore wishes to avoid subjecting him to those questions.

This court notes that, at the hearing, McGehee admitted, after initially denying, that he was not actually a licensed real estate agent:

> MR. GARDNER: Okay. Are you a licensed real estate broker in Mississippi?
> MR. MCGEHEE: Yes, sir.
> MR. GARDNER: Okay. Are -- are you the same William David McGehee?
> MR. MCGEHEE: That's me.
> MR. GARDNER: It says your license is closed.
> MR. MCGEHEE: Okay.
> MR. GARDNER: You might want to contact the commission about that.
> MR. MCGEHEE: Yes, sir. It might not be current on that, so
> MR. GARDNER: And do you have a broker in your firm? It says you -- you are a salesperson.
> MR. MCGEHEE: Right, right. I think we have -- the firm might want to check on that. I'm not sure.
> MR. GARDNER: Yeah, because to negotiate on land other than for yourself in Mississippi, you have to have an active real estate license.
> MR. MCGEHEE: Now -- now, the -- the agent that did the -- the lease agreement, did the actual real estate work, is -- is -- is licensed.

[Transcript at 25-26].

Thus, mere seconds after representing that he was a "licensed real estate broker," McGehee was forced to admit to the Board that this was not actually the case. For its part, this court is not particularly concerned with whether McGehee is a licensed real estate agent or not,

since, in either event, he is not qualified to discuss the report of an engineering expert. From this court's perspective, the significance of the above exchange is that it suggests that Verizon's sole witness at the hearing was caught in a falsehood by the Board regarding his basic credentials. This court must wonder why Verizon feels the Board should have given any greater credence to anything else that McGehee stated at the hearing after it had caught him being untruthful about his qualifications. In light of this exchange, it strikes this court as particularly ironic that Verizon would choose to take Supervisor Russell to task for his own lack of credentials in conducting his "layperson" experiments regarding cell phone coverage.

This court regards Tomlinson's failure to appear at the hearing as particularly unfortunate in light of the fact that his report contains a number of vague assurances regarding the issue of coverage which could have been delved into at the hearing. In the court's view, there is a conclusory, "trust me" quality to Tomlinson's report, which, as noted previously, includes a map containing a blue-shaded area of allegedly low coverage with no corresponding explanation of what that means in practical terms. In its brief, Verizon similarly states, in conclusory fashion, that "[t]he first propagation map attached to [Verizon Engineer] Mr. Tomlinson's letter showed the blue, low-coverage gap that currently exists in the vicinity of the Proposed Sugarcoated Tower." [Brief at 4]. Verizon writes in its brief that it "does not need to establish that there is an absolute dead zone to establish a substantial gap in its coverage," [Brief at 6] and it thus does not appear to suggest that Tomlinson's blue-shaded area represents an absence of coverage. Other than this, Verizon provides no insight into what the blue area represents in a practical sense, and this court therefore regards Tomlinson's map as being singularly unhelpful evidence in this case.

This court views Tomlinson's map as something of a red herring, since, as noted previously, Verizon itself acknowledges that federal courts have repeatedly held that the

coverage experienced by residents represents the relevant standard in this context. Whatever the blue area in Tomlinson's map represents in a practical sense, it provides no insights into the coverage experienced by actual residents, and it thus does not address the coverage issue which Verizon itself agrees is the determinative one in this case. As to the issue of in-building coverage, the best Tomlinson could offer in his report is that "[c]ustomers will experience access to mobile voice and wireless data services that **may** have been previously unavailable in their homes." [Administrative record at 24 (emphasis added)]. Thus, Verizon's sole witness did not assert in his report that the proposed tower would, in fact, address gaps in in-building coverage, merely that it "may" do so.

It is difficult for this court to discern how Verizon can dispute the County's first finding when its sole witness failed to affirmatively state that the proposed tower would address coverage gaps under the standard which it agrees to be the relevant one. Tomlinson's caution on the issue of in-building coverage is understandable, since his report provides no indication that he talked to any residents about the coverage they experienced, in buildings or otherwise. Tomlinson thus had no way of knowing whether any inadequacies existed in in-building coverage in the area, and Verizon itself did not introduce testimony from a single resident that they had concerns in this regard.[2] Once again, the sole testimony from actual residents was that they had acceptable coverage in the area, and, that being the case, it is difficult to discern how the County could have reached any other conclusion on the issue of a gap in coverage. In the court's view, Verizon's proof at the hearing was minimal at best, and the proof which McGehee did present was subject to severe credibility concerns in light of his having falsely represented

---

[2] When this court asked counsel for Verizon at the December 2 hearing why it produced no such testimony from residents, he responded "I do not know why that was not done."

his credentials to the Board.  The weakness of Verizon's proof in this case seems to be unique among federal case law, based not only upon the testimony at the hearing, but also upon Tomlinson's candid acknowledgement of the reasons behind the project and his uncertainty regarding the benefits which would result from it.

In light of the foregoing, the court concludes that the County's finding that Verizon failed to demonstrate a sufficient need for the project is supported not only by substantial evidence, but overwhelming evidence.  This conclusion necessarily impacts upon the court's discussion of the closely-related second finding, namely that "[t]here is insubstantial proof as to whether existing towers could or could not be enhanced so as to provide improved service to the area."  In the court's view, the key words in this finding are "improved service to the area," and, as discussed above, Verizon's evidence at the hearing was extremely weak regarding what the project, if implemented, would do to actually improve the service experienced by residents.  Thus, the court concludes that the weakness in the proof at the hearing likewise supports the Board's finding on the second issue.  This court will therefore turn to the County's third finding in this case.


**3. There is not sufficient evidence, there will be significant aesthetic
   effects to the community [sic]**

Verizon next argues that the County lacked substantial evidence in support of its conclusion that there would be a significant negative aesthetic effect upon the community.  In so arguing, Verizon initially acknowledges that four residents did, in fact, testify at the hearing regarding their aesthetics concerns about the project.  For example, Judy Jones testified that "[t]here are five homes that encircle this one cell tower. We all face it. It's in a valley, and each house on each hill just looks down on it."  [Hearing transcript at 30-31].  Terry Whitlock

similarly testified that "[a]nd looking out the back door going to the lake, the tower is going to be right there." [Hearing transcript at 29-30]. While acknowledging this testimony, Verizon argues that this court should essentially ignore it as simple "not in my back yard" evidence not entitled to any weight whatsoever.

In addressing the issue of aesthetics, this court believes that it is necessary to distinguish between evidence which has limited probative value and that which has no probative value at all. Verizon would have this court regard the fact that four residents bothered to show up at the hearing and testify that they had concerns about aesthetics as a complete legal nullity, but this court is not prepared to go this far. This court does agree that testimony such as that presented by Jones and Whitlock has limited probative value, and, if this were a case in which Verizon had presented even moderately persuasive evidence that the Proposed Sugarcoated Site would address a true gap in coverage, then this court would likely regard these aesthetics concerns as an insufficient basis to deny the project. As it stands, however, the County was faced with extremely weak proof regarding the need for the project, and, in light of that fact, this court believes that it appropriately gave some weight to the aesthetics concerns expressed by residents.

This court can discern no reason why a county should be forced to ignore concerns about retaining the beauty of its communities in the face of efforts by competing providers to build more and more cell towers as they offer increasingly generous data plans to consumers. In its brief, Verizon does not dispute that the County was permitted to consider the issue of aesthetics in deciding whether to authorize the project, and the question arises as to exactly what sort of proof it believes it was allowed to consider in this context. There is, in the court's view, an unrealistic quality to attempts to shout down, as "not in my backyard" concerns, the one form of proof which is likely to be presented on this issue, namely testimony from residents that they fear

for the beauty of their community if the project is built. Moreover, it seems clear that there is some objective information to be gleaned from the testimony of Jones and Whitlock, such as the fact that the Sugarcoated Tower would be easily visible from their homes. This strikes this court as objectively significant information, since it distinguishes the tower from one built in a location where it could not be seen from residents' homes.

In its brief, Verizon relies heavily upon the Sixth Circuit's decision in *T-Mobile Cent., LLC v. Charter Twp. of W. Bloomfield*, 691 F.3d 794, 805 (6th Cir. 2012) for the proposition that "not in my backyard" type concerns are insufficient in this context. *T-Mobile* is not binding authority upon this court, but, this aside, this court regards it as quite significant that, in that case, the Sixth Circuit was considering a case in which the provider's proof regarding the issues of both aesthetics and the need for the project was vastly more powerful than in this case. As to the issue of aesthetics, the Sixth Circuit was considering a proposed ninety (90) foot tower which "would have been disguised as a tree" in order to alleviate aesthetics concerns. *Id.* at 800. Thus, the Sixth Circuit was considering aesthetic concerns by residents in the context of a project in which the provider had clearly made great efforts to address the issue of aesthetics in designing the tower. In this case, by contrast, the proposed tower is one hundred and ninety feet, and Verizon does not assert in its brief that it made any efforts to disguise the tower as a tree or otherwise make it more aesthetically pleasing to residents.

In *T-Mobile*, the provider could proudly boast in its brief that, in light of the care taken in designing the tower, "there are few—if any—wireless support structures that could be more aesthetically pleasing." *Id.* In this case, by contrast, Verizon's entire briefing on this issue consists of arguments that the four residents who bothered to show up and testify on the issue of aesthetics should be treated exactly the same as if they had decided to stay at home. It seems

highly likely that, if not a single witness had showed up at the hearing to testify about his aesthetics concerns *vis a vis* the project, then Verizon would be heavily trumpeting this fact in its briefing. Four residents did show up to testify on this issue, and this court is not prepared to declare their stated concerns to be the complete nullity which Verizon appears to regard them as being.

That brings this court back to the issue of need, which, in its view, provides the proper context in which to consider the issue of aesthetics. It seems clear to this court that, in any case involving a cell tower which is proposed to be built over local opposition, the issue of the weight to be given to that opposition cannot be divorced from that of the demonstrated benefits of the project. Indeed, Congress' basic motivation in enacting the TCA appears to have been to balance local interests such as aesthetics with the nation's need to have a modern and effective telecommunications system. It thus seems significant that, with regard to the issue of need, the Sixth Circuit in *T-Mobile* observed that the provider had demonstrated, through "voluminous amounts of evidence" which included not only "coverage maps" but "detailed reports" that "the lack of coverage in this area [was] a long-standing issue" and that the proposed tower "would not only fill coverage gaps for in-car usage ... [but also for] in-home coverage." *T-Mobile*, 691 F.3d at 804-05.

In this case, by contrast, Verizon's sole witness could not even affirmatively represent that the tower would, in fact, expand in-building coverage, and it did not present any evidence, much less voluminous evidence, that current coverage in this regard was regarded as inadequate by even a single resident. Indeed, while *T-Mobile* represents Verizon's main authority on this issue, it, along with other decisions such as *Wyandotte County,* serves to demonstrate to this court what a carefully planned and presented cell phone tower proposal actually looks like. That

is to say, it bears virtually no resemblance to the one presented by Verizon here.  Thus, while this court does not believe that the aesthetics concerns expressed by residents in this case would have been entitled to much, if any, weight in a case involving substantial proof of need, it concludes that the County legitimately considered it as one factor militating against the exceedingly weak proposal in this case.

> **4. The no build zone of 142.5 feet, set forth in the DeSoto County Zoning Ordinance, has not been met, as the distance to property line of the James' property is 137 feet, and the first outbuilding is 178 feet away and tower is 190 feet.**

The court next addresses the County's fourth finding, namely that "[t]he no build zone of 142.5 feet, set forth in the DeSoto County Zoning Ordinance, has not been met, as the distance to property line of the James' property is 137 feet, and the first outbuilding is 178 feet away and tower is 190 feet."  This court regards this as being the weakest of the County's five offered reasons for refusing to authorize the Project, since it has failed to offer any specific rebuttal to defendant's detailed arguments that, as a factual matter, the proposed tower would not have been located unduly close to the James property.  Specifically, Verizon argues in its brief that:

> The height of the Proposed Sugarcoated Tower, with its lightning rod, is 190 feet. Seventy-five percent of that is 142.5 feet. The "No-Build Zone" is clearly marked on the site plans for the Proposed Sugarcoated Tower and there are no existing structures within that area. *See* Joint Exhibit 1 at 30-31. There was no evidence at the hearing that contradicted this or even suggested the Proposed Sugarcoated Tower would be built within 142.5 feet of any existing structure.  Accordingly, the Board's finding that the Proposed Sugarcoated Tower violated the "No-Build Zone" was not based on any evidence, much less substantial evidence.

[Trial brief at 12].

The closest the County appears to come to addressing Verizon's arguments on this issue is its assertion that "while [Verizon attorney] Mr. Hargis and Mr. McGehee certainly presented the pictures and graphs provided by Verizon, neither were able to answer the Board's technical

questions regarding the towers location and construction with anything other than layman's opinions." [Trial brief at 3]. In the court's view, this argument is not directly responsive to Verizon's argument quoted above, and it will therefore assume for the purposes of this order that the Board lacked substantial evidence to support its finding regarding the distances between the proposed project and the James property. At the end of the day, however, this factor is merely one of five factors cited by the Board in support of its decision, and the Fifth Circuit has made it clear that it does not expect perfection from local board members in making assessments regarding often difficult and technical issues, so long as its ultimate decision in supported by substantial evidence.

Indeed, the Fifth Circuit emphasized in a 2004 decision that the appropriate consideration in this context is whether the municipality's "ultimate conclusion" is supported by substantial evidence, even if did not necessarily frame all aspects of that conclusion with precision:

> U.S. Cellular seizes on a number of inexact statements by councilors and tower opponents. Many of the comments made at the Council meeting were not strictly germane to the issue before the Council, and the ordinance revoking the permit stated that the proposal "violates setback requirements" rather than stating more precisely that "the City Council chose not to grant a waiver of the general setback requirements." However, the council members and their constituents are not technocrats, and substantial evidence review *does not require that the arguments and determinations be stated with exacting precision so long as the ultimate conclusion is undergirded by reasonable evidence.* Ultimately, we need not determine whether the Council's decision was unwise. Under substantial evidence review, the City need not even demonstrate that a preponderance of the evidence supported its decision; rather, the City need only demonstrate that the Council had some reasonable evidence to support the conclusion that the proposal did not conform to setback requirements and that no reduction was warranted.

*U.S. Cellular Corp. v. City of Wichita Falls, Tex.,* 364 F.3d 250, 258–59 (5th Cir. 2004) (emphasis added).

At the December 2 hearing, Verizon attempted to minimize the importance of the *Wichita Falls* decision by arguing that it involved certain factual weaknesses unique to that case. While

that may well be true, the same could emphatically be said for this case.  Indeed, the proof

presented by Verizon in this case was far weaker than that in any other case which this court has

reviewed.  In *Wichita Falls*, for example, the Fifth Circuit noted that "U.S. Cellular identified a

gap in its coverage in southwest Wichita Falls," and there is no indication in the record that the

city had questioned the provider's evidence on this crucial issue.  In this case, by contrast,

Verizon's own expert did not assert that the Project would, in fact, expand coverage under the

resident-based standard which Verizon agrees is relevant, and he failed to show up at the hearing

to defend any of his conclusions.  Moreover, while Verizon attempts to dismiss the testimony of

residents, it provided no expert of its own at the hearing, and no residents testified that there was

a need for the project.  It thus seems clear that the proof regarding the basic need for the project

in this case was much weaker here than in *Wichita Falls*, and the issue of the basic need for the

project strikes this court as representing a much more important one than the question of whether

the tower would have been located unduly close to one specific resident's home.

These considerations aside, Verizon's attempts to minimize *Wichita Falls* as a narrow

decision flies in the face of a great deal of language in the opinion regarding the deference to be

shown to local governmental entities in this context.  For example, in discussing the basic

standard of review, the Fifth Circuit wrote in *Wichita Falls* that:

> Accordingly, "substantial evidence" is "such reasonable evidence that a reasonable mind
> would accept to support a conclusion." A finding of substantial evidence requires "more
> than a mere scintilla and less than a preponderance." … However, the reviewing court
> may not "re-weigh the evidence or substitute [its] judgment" for the judgment of the local
> government.  Substantial evidence review is therefore "highly deferential." The plaintiff
> carries the burden of proving that no substantial evidence supports the local government's
> decision.

*Id.* at 255–56.  (internal citations omitted).  It cannot seriously be argued that these observations

represent a narrow, fact-driven analysis, and, once again, the Fifth Circuit emphasized in *Wichita*

*Falls* that this deferential standard relates to the municipality's "ultimate conclusion" in the case.

16

Moreover, the highly deferential words above were written in the context of a case in which the Wichita Falls city council did not even issue a written order explaining the vote of its members. *Id.* at 255. In this case, by contrast, the County did issue a written order explaining its ruling, and this court can discern no reason why the Fifth Circuit would not show the County's ruling in this case at least the same degree of deference which it showed the municipality in *Wichita Falls*. Although this court agrees with Verizon that the County likely was operating under a misconception of some sort regarding the distance between the proposed tower and the James' property, this issue strikes this court as being a quite minor one in comparison to issues such as the basic need for the project. Thus, while this court will credit Verizon with having raised doubt upon the County's findings on this one factor, this fact does not alter its evaluation of the basic wisdom of the decision regarding the Project.

**5. The construction of the tower will adversely affect the drainage in this area.**

This court now turns to the county's fifth and final finding, namely that "[t]he construction of the tower will adversely affect the drainage in this area." This court's view of the proof on this issue is similar to its view of the aesthetics issue, since it believes that the strength of the proof which the County should reasonably require regarding the potential harm of the project is appropriately considered in light of the strength of Verizon's own proof regarding the need for the project.

At the hearing, resident Judy James testified regarding her concerns on the drainage issue, stating that:

The proposed tower is set in a valley where there is a natural water flow.

This water – actually, I don't know where it starts exactly but I know it comes from Honeysuckle Lane all the way down Nail [Road] and crosses Nail Road across our driveway. My husband many years ago – and we've dealt with this over the 47 years – has planted about eight crossties across the driveway. It is now blacktopped, and – and we're comfortable with that. But it's taken a lot of work.

That's how much water flows across there. It flows across Mr. Belew's back property in his back yard and so forth and goes through to this valley. So that's a concern for me. Is the ground stable enough. Does it get dry enough to support something of this nature?

Doc. 27 at Ex. B at 31:3-16.   Supervisor Russell appeared to vouch for James's concerns in this regard, stating that "I also believe that this location would adversely affect the drainage off of Nail Road. There's a tremendous – as stated by Ms. James, there's a tremendous drainage that comes off of Nail Road and goes to the retention pond that -- that this will be installed in the direct path of."  [Hearing Transcript at 64].

This court certainly does not regard the above as compelling evidence on the drainage issue, but it believes that James' testimony indicates that there is a genuine cause for concern regarding drainage issues related to the project.  In so stating, this court emphasizes that, while James is not an expert on this issue, she testified that she had personally dealt with serious drainage issues affecting her driveway and that the tower would be in the path of a natural drainage area.  As quoted above, Supervisor Russell expressed similar concerns on this issue, and Verizon certainly presented no expert testimony of its own that these concerns were ill-founded.  This court therefore regards the county's findings on the drainage issue to have been supported by substantial evidence in the record.

## CONCLUSION

If one were to view each of the County's five findings discussed above as being entitled to equal weight, then Verizon could, arguably, make a reasonable case that the Board's decision in this case should be overturned.  After all, this court has agreed with Verizon that the County's

fourth finding is lacking in substantial evidence in the record, and it has found that the proof

supporting its third and fifth findings to be substantial, but far from compelling. In the court's

view, however, the first factor, relating to the proof regarding the basic need for the project, goes

to the very heart of why Congress saw fit to enact federal language in this context in the first

place. There is clearly a national interest in ensuring that citizens who travel through or live in a

particular area have access to satisfactory cell phone coverage, and, in cases where inadequacies

in this context have been demonstrated, purely local concerns such as aesthetics and property

values must often give way. Conversely, however, if a provider fails to demonstrate gaps in

coverage under the standards which it itself agrees are applicable, then it should not reasonably

expect to seek recourse under federal law which was enacted to address those gaps.

On a more fundamental level, this court does not believe that any provider should expect

to prevail at a hearing, in the face of public opposition, if it does not make any greater efforts to

prove its case than Verizon did here. A necessary part of prevailing at any hearing is actually

showing up with individuals prepared to prove one's case, and Verizon failed to do so here.

Moreover, the sole witness which Verizon did present was heavily impeached by having been

caught by the Board in false testimony. In other TCA cases which this court has reviewed in this

context, the providers have provided sufficient proof of need so that either the local

governmental body does not contest the issue (as in *Wichita Falls*), or a federal court has found

the proof of need to be overwhelming (as in *T-Mobile* and other decisions).[3] In this case,

_____

[3] For example, the district judge in *Branch Towers* wrote that: "The Court finds that
plaintiffs have demonstrated a significant gap in service coverage through the propogation maps,
the opinion of T-Mobile's engineer, Mr. Blewitt, and MPC's own consultant, Mr. Perry. As Mr.
Perry notes, 'there is very little signal coverage in the area ... [and] the addition of a cell site here
... would probably eliminate the need for other sites nearby.' Neither the City nor the amicus
petitioners have submitted evidence to contradict the evidence supplied by the plaintiffs."
*Branch Towers*, 2016 WL 3747600, at *6. Thus, unlike in this case, the plaintiff in *Branch*

however, Verizon did not present any evidence whatsoever that the coverage received by actual residents (in their homes or otherwise) was inadequate. Indeed, the sole testimony on this issue, from James and Russell, was that existing coverage was fully satisfactory. The members of the Board were elected to represent the interests of actual *residents*, and if Verizon is unable to make its case in terms of the coverage experienced by such residents, then it should not expect to find a warm reception from any elected board.

As noted previously, Tomlinson wrote in his report that the project in this case "is required to offload Verizon's existing sites that have recently been taxed with heavy usage stemming from the new Verizon Unlimited Data Plan." [Tomlinson letter at 1]. This court regards this sentence in Tomlinson's report as constituting very important evidence in this case, since it provides the best indication, which it can discern, regarding what is actually motivating Verizon's actions here. If Tomlinson had cited, say, an increase in population as supporting the need to offload existing sites, then this court would be much more sympathetic to Verizon's position in this case. As the record stands now, Tomlinson's report seems to raise the spectre of Verizon's marketing department becoming the tail wagging the dog of land use decisions in Desoto County, and this court is unwilling to misapply federal law to allow that to happen.

It appears, based on Tomlinson's report, that Verizon made a business decision to offer a new data plan, experienced congestion as a result, and is now seeking to invoke federal law to force the building of a new tower over local opposition to cope with the results of that business decision. It seems clear that the responsible course of action for any provider is to first ensure that it has the necessary capacity before offering a new data plan, rather than presenting a local

---

*Towers* had a consultant who testified that there was "very little signal coverage" in the area in question, and there was no testimony to the contrary from the defendant.

government with a *fait accompli* which, it argues, requires that it be allowed to build the tower of its choice in the location of its choice. While Verizon may have legitimate business reasons to offer high capacity data plans, it would be well advised to work with local governments and residents to persuade them of the benefits of approving projects to facilitate those plans prior to implementing them, instead of using the federal courts to bully municipalities into rubber-stamping them after the fact. As discussed previously, the federal authority which Verizon itself cites speaks in terms of an "lack of" coverage in buildings and other locations[4], not ensuring providers the competitive advantage of high-speed internet data plans.

In the court's view, providers may have potentially compelling arguments for increasing high-speed data capacity, but those arguments can be fully addressed at the local level. Local governments are fully capable of deciding how the relative benefits and burdens of implementing those plans should best be balanced in their community, and this court sees no reason why federal courts should instruct local governments that they must always come down on the side of unlimited monthly data plans. Once again, the implementation of such a plan is what Verizon's own engineer asserts is the precipitating cause of the need for the new tower in this case. This court can discern a strong federal interest in ensuring that a citizen driving from New York to Los Angeles is able to use his cell phone for as long a period as possible, but it sees no strong federal interest in ensuring that residents in a particular area are able to have unlimited data plans

---

[4]*See Branch Towers*, 2016 WL 3747600, at *6, *citing T-Mobile W. Corp. v. City of Huntington Beach,* No. CV 10-2835 CAS, 2012 WL 4867775, at *17 (C.D. Cal. Oct. 10, 2012); *T-Mobile W. Corp. v. City of Agoura Hills*, No. CV 09-9077 DSF, 2010 WL 5313398, at *8 (C.D. Cal. Dec. 20, 2010); *MetroPCS New York, LLC v. Village of East Hills*, 764 F. Supp. 2d 441, 453 (E.D.N.Y. 2011); *T-Mobile Cent., LLC v. Wyandotte Cty.,* 528 F. Supp. 2d 1128, 1169 (D. Kan. 2007).

each month.  Local governments are fully capable of balancing the benefits and burdens which exist in this context for their citizens.[5]

It strikes this court that applying the TCA in the manner urged by Verizon would mean that municipalities would essentially be at the mercy of whatever newer and faster data plans providers chose to offer, with no ability to protect their communities from the proliferation of cell phone towers, as various competitors sought to continually "one up" each other in upgrading the capacities of their networks.  This court is not accustomed to overturning a Mississippi county's decision regarding a local land use matter, and it is only the policy concerns raised by the TCA which might even potentially require it to do so.  This court sees no indication whatsoever that these concerns are implicated in this case.  Indeed, Verizon did not even openly promote the project in this case as one to implement high speed data coverage, presumably because it knows that federal authority guarantees certain minimal levels of coverage, not unlimited monthly data plans.

As a final observation, this court emphasizes that, if its suspicions regarding Verizon's motives are ill-founded, then nothing in this order is intended to prevent it from filing a new petition which is supported by stronger proof.  This court's order today is based upon the quite weak factual showing which Verizon made at the hearing below, and it might well have reached a different conclusion if Verizon had simply made greater efforts to prove its case.  Indeed, it strikes this court that, rather than appealing the county's decision to this court, Verizon would have been well advised to take its findings to heart and take the necessary steps to provide the

---

[5] This court is aware that some favor a broader assertion of federal authority in this context, but the crucial point is not personal opinions on this matter, but rather the binding federal precedent interpreting the TCA.  Once again, Verizon's own authority speaks in terms of much more modest coverage goals than the unlimited data plan which, Tomlinson asserts, has made the additional cell tower necessary in this case.

information which the Board members found to be necessary. This is assuming, of course, that there is actually a genuine need to be proven in this case (which is far from clear). If, as this court suspects, Verizon was unable to make a showing of need under the relevant federal standards because the facts simply do not support it, then it would be well advised to find a location for its tower which does not give rise to the same degree of public opposition as that generated by the Project in this case.[6]

If offering more high speed internet coverage is Verizon's true goal, as Tomlinson's report suggests, then it should be upfront in acknowledging that fact, instead of making disingenuous arguments that the existing coverage does not meet the far lower standards required by federal case law interpreting the TCA. While this court does not believe that Verizon could legitimately use federal law to coerce a municipality into approving a project designed to facilitate more high speed internet coverage (in an area with otherwise satisfactory cell phone coverage), this does not mean that the prospect of such coverage upgrades would be unattractive to some residents, if it were presented to them. This court can discern no reason why Verizon could not seek to persuade some residents of the benefits of such coverage and thereby seek for them to show up at hearings and speak on its behalf. That is how democracy works. Regardless of Verizon's motives in this case, it has failed to demonstrate a "substantial gap" (or any gap) in coverage under federal standards, and, this court finds that, in light of the weakness of its proof at the hearing, the County's decision to reject the project in this case was supported by substantial evidence.

---

[6] This court notes that, at the hearing, the Board did not appear unalterably opposed to a new cell tower being built in some location. For example, Supervisor Gardner noted at the hearing that "we had one of your competitors once. There was some opposition to that site. They decided to go with the fire station and worked out a deal with the fire department for, you know, use of the tower. And – and all things worked out well." [Hearing order at 16].

It is therefore ordered that Verizon's motion for an injunction seeking to order the County to approve the Project in this case is denied, and this case is closed.

A separate judgment will be entered this date, pursuant to Fed. R. Civ. P. 58.

This, the 16th day of December, 2019.

/s/ Michael P. Mills
U.S. DISTRICT COURT
NORTHERN DISTRICT OF MISSISSIPPI